928 So.2d 1178 (2006)
Marvin JONES, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-282.
Supreme Court of Florida.
April 13, 2006.
*1180 Robert A. Norgard, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Charmaine Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Marvin Jones was convicted of first-degree murder and attempted first-degree murder and sentenced to death. We affirmed his convictions. See Jones v. State, 690 So.2d 568, 570-72 (Fla.1996). He now *1181 appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As we explain below, we affirm the circuit court's order denying the motion on all issues.

I. FACTUAL AND PROCEDURAL BACKGROUND
Jones purchased a used automobile from Ezra Stow, the owner of San Pablo Motors in Jacksonville, Florida.[1] The following month, Jones returned the car to Stow because of a "blown engine." They entered into an agreement to rebuild the engine for $1,500. Jones would pay Stow $800 up front, and Stow would finance the rest. When the repairs were complete, Stow asked for $800, but Jones instead gave him a check for $4,200 to pay the entire amount owed for the car and repairs and drove the car off the lot.
At the time, Jones had been unemployed for more than a year and knew that he only had five dollars in his bank account and had previously bounced six other checks. The bank notified Stow that Jones's check had bounced. Stow's twenty-two-year-old daughter Monique called Jones, who agreed to come to San Pablo Motors on March 3, 1992, and make good on the check. Jones arrived at San Pablo Motors, went into the trailer to Stow's office, and told him he had to get something from his car.
Jones returned to the trailer with a .25 caliber automatic pistol and shot Monique. Stow heard the shots and started to reach for his gun. Jones rushed into Stow's office and aimed his gun to shoot him in the face. Stow threw up his arm as Jones fired and the bullet went through his forearm and then grazed his head. Stow fell to the floor, momentarily unconscious. Jones then came around the desk and shot him a second time. Jones took the papers for the car from Stow's desk and fled the scene. Stow survived his injuries, but Monique Stow died later that night.
The jury found Jones guilty of the first-degree murder of Monique Stow and attempted first-degree murder of Ezra Stow. At the penalty phase, the jury recommended death by a vote of nine to three. The trial judge followed the recommendation, finding three aggravators: "(1) a previous conviction for a violent felony based on the contemporaneous conviction for attempted first-degree murder of Ezra Stow; (2) that the murder of Monique Stow was committed in a cold, calculated, and premeditated manner; and (3) that the murder of Monique Stow was committed for pecuniary gain." Jones, 690 So.2d at 569-70. The court determined that they outweighed two mitigating circumstances.[2]
On appeal of the convictions and sentence, Jones raised four issues.[3] This *1182 Court found no merit to any of them and affirmed his convictions.
In April 2002, Jones filed an amended 3.850 motion for postconviction relief, raising twenty-three claims.[4] The circuit court denied relief on all of them. Jones now raises ten issues, many of which contain several subparts.

II. ANALYSIS
Of Jones's many claims on appeal, we address only a few. Many of his claims are procedurally barred or legally insufficient, and therefore we deny them without discussion.[5]See Johnson v. State, 593 So.2d 206, 208 (Fla.1992) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Other claims present merely conclusory arguments insufficient to state an issue.[6]See LeCroy v. Dugger, 727 So.2d 236, 240 (Fla. 1998) (upholding the summary denial of a postconviction motion because the defense alleged no facts to substantiate its conclusory claims of ineffective assistance of counsel); see also Randolph v. State, 853 So.2d 1051, 1063 n. 12 (Fla.2003) ("[T]he purpose of an appellate brief is to present arguments in support of the points on appeal.") (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990)). Other claims are clearly meritless.[7]See Teffeteller v. *1183 Dugger, 734 So.2d 1009, 1023 (Fla.1999) ("Trial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding."). Finally, some claims were raised on direct appeal and we decided them against Jones.[8] We now address Jones's remaining arguments.[9]

A. Mental Health Testimony
Jones claims that trial counsel rendered ineffective assistance by failing to investigate and present mental health testimony. The following standards apply to all ineffective assistance claims:
An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."
Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The prejudice prong of the analysis "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Therefore, to succeed on his claims, Jones must establish both deficient performance and prejudice.
Jones argues that trial counsel failed to present the testimony of Dr. Ernest Miller.[10] This testimony, Jones argues, should have been presented to rebut the cold, calculated and premeditated (CCP) aggravating circumstance. At the evidentiary hearing, trial counsel testified that he retained Dr. Miller, a psychiatrist, to examine Jones because he wanted to resolve the tension between Jones's "golden" past as a "model citizen" and the crimes he committed. In addition to his interview with Jones, Dr. Miller reviewed copies of the offense and incident report, the homicide continuation report, the motion and information filed, the affidavit for arrest warrant, and the evidence technician's reports. He provided a report, dated November 5, 1993, to trial counsel stating that Jones was competent to proceed and not insane at the time of the offense.
From his testimony at the hearing, Dr. Miller would have testified about specific aspects of Jones's mental health. Dr. Miller confirmed that Jones had a "compulsive personality." He further testified that, when a person of this nature faces disorder, more primitive emotions surface and destructive behavior can result. His mental state may result in "unpredictable and violent acts." Jones's problems finding employment after leaving the Navy, his financial problems, and his separation from *1184 his wife and two daughters substantially impacted him. Other "stressors" like his conflict with Stow and his car's mechanical problems were also significant. Dr. Miller opined that Jones's crimes were not "logically planned" but, instead, "emotionally reactive." However, Dr. Miller also stated that "a compulsive personality can function quite well in this world."
Trial counsel did not "think there were many, if any, areas of Dr. Miller's report that at the time would have caused [him] alarm that [he] should have sought . . . more psychiatric testimony." Therefore, he did not discuss with Dr. Miller Jones's mental state at the time of the crime or any information that could potentially rebut the CCP aggravator. He also never asked Dr. Miller to do any follow-up interviews, investigations, or evaluations.
In denying Jones relief on this issue, the circuit court found that "[t]he evidence Defendant suggests should have been presented during the penalty phase was inconsistent with evidence that was actually presented by the defense at the penalty phase." We have affirmed denials of relief in similar circumstances. "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (quoting State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987)). In Banks v. State, 842 So.2d 788 (Fla.2003), the defendant argued that defense counsel was ineffective for failing to consult mental health experts. Id. at 790. However, counsel did consult experts and "decided on a strategy after considering his options." Id. at 791. The experts' reports discussed the defendant's alcoholism and possible childhood physical abuse. Id. We found no deficient performance because counsel felt that the child abuse strategy would be ineffective and that introducing evidence of the defendant's consumption of alcohol would be inconsistent with his theory of the case. Id.
Trial counsel have discretion in determining whether and how to present mental health evidence. In Jones's case, counsel made a strategic decision not to call Dr. Miller as a witness to rebut the CCP aggravator. We find three bases for this conclusion: (1) Dr. Miller's testimony would have been inconsistent with other evidence already presented; (2) counsel did not want to "open the door" to damaging cross-examination and rebuttal evidence; and (3) trial counsel decided to focus on the "humanization" of Jones through lay testimony. We explain each of these points in turn.
First, Dr. Miller's testimony that Jones's financial problems impacted him would have contradicted and undermined evidence already presented. For example, at the penalty phase Jones's wife testified that she moved to Pensacola with their children not because of financial issues, but to be closer to her family. Meanwhile, Jones sought employment, turned down unsuitable job offers, and saved money from his unemployment checks. He was seeking a "better job" close to his family and never got frustrated over his unemployment. He also purchased a car during that time. His financial problems were clearly minimal at best, which would have contradicted Dr. Miller's testimony.
In addition, the circuit court concluded that "[t]he . . . testimony . . . during the penalty phase painted a picture . . . of a loving family man." The testimonies of Jones's siblings, wife, friends, and parents established that Jones was not violent and had never been in trouble with the law. In particular, Jones's brother-in-law testified that Jones was a "family man . . . enjoyed being with the kids . . . and with his wife." He was not violent, but a "soft spoken type *1185 of guy, always went out of the way to help others." Dr. Miller's testimony regarding Jones's "emotionally reactive" and destructive behavior would have been counterproductive and might have diminished this persuasive picture of a loving family man.
Second, "[c]ounsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence." Johnson v. State, 921 So.2d 490, 501 (Fla. 2005) (citing Breedlove v. State, 692 So.2d 874 (Fla.1997)). Dr. Miller's report merely indicates that Jones had a common problem coping with stressful situations. Nothing else in the record demonstrates that Jones was mentally ill. In fact, Dr. Miller admitted that individuals such as Jones "can function quite well in this world." His testimony would have harmed, rather than helped, Jones. His statements regarding Jones's "primitive emotions," "emotionally reactive" and "destructive" behavior, and "unpredictable and violent acts" would have cast serious doubt on the jury's "picture . . . of a loving family man." Therefore, trial counsel understandably did not want to "open the door" to these aspects of Dr. Miller's testimony on cross-examination by calling him as a witness during the penalty phase. They would counter any marginal value that might be gained from the testimony as a whole. In light of the stronger evidence of Jones's background, when viewing Dr. Miller's report the right move for trial counsel was to do nothing. He made a strategic decision to withhold this less compelling, and potentially damaging, information.
Due to these problems, trial counsel could not resolve the tension between Jones's "golden" past and the crimes he committed. Thus, at the penalty phase, he concentrated on the testimonies of Jones, Jones's family, and his friends. We have found no deficient performance where, although counsel was aware of possible mental mitigation, he made a strategic decision to focus on the "humanization" of the defendant through lay testimony. See Rutherford, 727 So.2d at 222-23 (where trial counsel was aware of the defendant's personality disorder and purported alcoholism, but instead focused on the lay testimony from a friend, family members, and the defendant himself regarding his positive character traits, his meager upbringing, and the consequences of his involvement in Vietnam). The testimonies of Jones, Jones's family, and his friends clearly portray Jones as a "model citizen." In his eight years in the Navy, Jones received two honorable discharges, two "good conduct awards," top scores in his annual performance evaluations, and various medals, awards, commendations, and ribbons. Jones's sister, Ardee Harris, testified that he "was one of those fun loving people [who] could get along with everybody." He looked after his siblings and interacted well with them. He was not a violent person, and he always spent time with his family and interacted well with his wife's family. Jones's wife stated that he was a "loving, caring father." Almost all of the witnesses testified that he never had any problems with the law. In addition, Jones expressed deep remorse for his crimes.
As in Rutherford, trial counsel elected, under the circumstances, to "humanize" Jones. Counsel made an informed choice and most likely reasoned that focusing on Jones's background was the best strategy. Jones, therefore, cannot demonstrate that counsel's performance was deficient.
Even if counsel had rendered deficient performance, however, Jones cannot demonstrate prejudice. Dr. Miller's testimony *1186 was not persuasive and, even worse, could have damaged Jones's chances for a life sentence. Furthermore, Jones fails to show that the testimony would have changed the jury's recommendation of death or the trial court's imposition of the death penalty. Dr. Miller's unconvincing testimony does not undermine our confidence in that result. Accordingly, we deny this claim.

B. Mitigation Evidence
Jones next argues that trial counsel rendered ineffective assistance by failing to investigate and present mitigation evidence. In particular, Jones raises four ineffective assistance arguments: (1) failure to investigate mental health testimony; (2) failure to present mental health testimony from Drs. Miller and McMahon; (3) failure to present evidence of Jones's positive and courteous behavior throughout the judicial proceedings and his model behavior while in prison; and (4) failure to present additional testimony from friends and family members regarding Jones's remorse for his crimes. Under Strickland, Jones must establish both deficient performance and prejudice.
First, Jones argues that the testimony of Drs. Miller and McMahon established mitigating factors regarding his mental health problems. He claims that trial counsel rendered ineffective assistance by failing to investigate this evidence. "[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." State v. Riechmann, 777 So.2d 342, 350 (Fla.2000); see also Ragsdale v. State, 798 So.2d 713, 719 (Fla.2001) (finding counsel ineffective where his "entire investigation consisted of a few calls. . . by his wife to [the defendant's] family members"); cf. Pietri v. State, 885 So.2d 245, 261 (Fla.2004) (finding no ineffective assistance where trial counsel made reasonable efforts to secure a mental health expert to examine the defendant for mitigation purposes). Here, trial counsel retained Dr. Miller to examine Jones, thus complying with this duty.
Nevertheless, Jones argues that trial counsel was ineffective by failing to call Dr. Miller during the penalty phase and locate an expert such as Dr. McMahon and present her testimony. The analysis of Strickland's performance prong includes "a context-dependent consideration of the challenged conduct as seen `from counsel's perspective at the time.'" Wiggins, 539 U.S. at 523, 123 S.Ct. 2527 (emphasis added) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). We must "make every effort to eliminate the distorting effects of hindsight." Blanco v. Wainwright, 507 So.2d 1377, 1381 (Fla.1987). Based on interviews with Jones's family and friends, his reviews of Jones's military and school records, Jones's lack of a criminal record, and his lack of addiction to drugs or alcohol, trial counsel found that Jones was neither insane nor incompetent. Trial counsel did not "think there were many, if any, areas of Dr. Miller's report that at the time would have caused [him] alarm that [he] should have sought . . . more psychiatric testimony." We agree with the circuit court that "[e]verything in [Jones's] family, school, Navy, and employment history indicated that [he] did not suffer from significant psychological disorders or deficits and was instead a well-rounded, loving family man."
Furthermore, those aspects of Dr. Miller's testimony regarding Jones's background would have been cumulative. In denying relief, the circuit court stated that "there were several witnesses who testified and virtually all of the information contained in Dr. Miller's report was presented *1187 to the jury." The court further stated as follows:
[T]he testimony was presented by people who were either closely related to Defendant or shared a long-term relationship with him. These people . . . were in a better position to testify about non-statutory mitigation than Dr. Miller. . . . Any testimony that Dr. Miller could have provided would have been largely cumulative to the testimony presented by Defendant's family and friends.
Counsel does not render ineffective assistance by failing to present cumulative evidence. Cole v. State, 841 So.2d 409, 425 (Fla.2003) (holding that trial counsel did not render ineffective assistance by failing to present cumulative evidence of drug and alcohol abuse and child abuse) (citing Valle v. State, 705 So.2d 1331, 1334-35 (Fla. 1997)).
The circuit court's order states that Dr. Miller's report contained information regarding Jones's
relationships with his [siblings] . . . education. . . history in the Navy . . . stable marital relationship . . . stable residential history . . . compulsive personality. . . lack of history of violence . . . that [Jones] never had a drinking problem and has never used street drugs; that [Jones] has been depressed since the incident . . . his estimated intelligence. . . positive recreations and hobbies; and his positive personality traits.
Trial counsel stated that he presented almost all of this information through other witnesses (Jones's parents, sister, wife, and best friend), including Jones himself. Jones's sister testified that Jones was "one of those fun loving people, could get along with everybody." Jones's father explained that Jones never got into trouble with the law. Jones's mother testified that Jones interacted well with his siblings and that he expressed remorse for his crimes. Jones's brother-in-law testified that Jones always spent time with his family and interacted well with his wife's family. He further stated that Jones was not violent, but a "soft spoken type of guy, always went out of the way to help others." Jones's wife testified that Jones was a "loving, caring father" who participated in the marriage and the raising of their children. Jones himself testified at great length about his distinguished career in the Navy. Finally, Jones's best friend, Robert Walker, testified that Jones engaged in recreational activities, including playing the trumpet, and playing in talent shows and fundraisers.
Through these witnesses, trial counsel "felt that [he] had established . . . Jones's family life, his married life, his career to a substantial extent in front of [the] jury." Any testimony from Dr. Miller would have been cumulative to the testimony from Jones's wife, parents, siblings, and best friend.
In addition, trial counsel stated that "there were some areas of Dr. Miller's report that [he] did not want the state to go into." "Counsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence . . . ." Johnson, 921 So.2d at 501; see also Gaskin v. State, 822 So.2d 1243, 1249 (Fla. 2002) (noting that "the witnesses who [the defendant] alleges should have testified on his behalf were subject to being cross-examined about disturbing information about [the defendant], which would have defeated trial counsel's strategy"). Trial counsel felt that, on cross-examination, if the State solicited information regarding his conversations with Dr. Miller, something from those conversations would have adversely affected Jones. He identified Jones's stress at the time of the crimes as *1188 the problem he wanted to avoid on cross-examination. Furthermore, Dr. Miller felt that the circumstances in this case could arise again with the right amount of stressors or stress-related incidents. Trial counsel also maintained that Dr. Miller "had some concerns with . . . Jones's rendition of the story."
Given this potentially damaging information as well as the unpredictable nature of cross-examination, counsel made a reasonable strategic decision to withhold the testimony. He had presented substantial mitigation through other witnesses and, therefore, the risk of calling Dr. Miller outweighed the cumulative benefit of his testimony. Jones cannot demonstrate that counsel's decision was deficient. Furthermore, because the information in Dr. Miller's report was presented through other witnesses, Jones also cannot demonstrate prejudice. Accordingly, we affirm the circuit court's findings.
Regarding Dr. McMahon, the circuit court concluded as follows:
Dr. McMahon's report perhaps provides a more detailed perspective of Defendant's personality and psychological profile. However, her findings and conclusions, are largely consistent with Dr. Miller's opinion that Defendant was essentially normal from a psychological perspective.
Dr. McMahon examined Jones and interviewed his family. She prepared a written report and, at the evidentiary hearing, testified as to what was contained in that report as well as her observations and findings regarding Jones. She agreed that the resulting crimes were "totally out of character" for him. She stated that, when Jones experiences anxiety, he "tends to regress . . . . tends to function at a less . . . mature level," which was not unusual. If Jones "can't get out of a situation and it continues to be highly emotionally charged, then . . . his emotions become more determinative of his behavior." She added that, on the day of the incident, Jones perceived Mr. Stow as treating him like a child and stealing from him. In these situations, Jones regresses, and "his perceptions become distorted." However, she testified that Jones's IQ level did not suggest "any kind of cognitive d[y]sfunction." Jones's neuropsychological assessment was within normal limits, and he had good impulse control.
This testimony, like Dr. Miller's, does not suggest any serious mental disorders. We agree with the circuit court's findings:
Dr. McMahon's evaluation of Defendant largely corroborates that conducted by Dr. Miller. Both professionals found Defendant to be essentially normal . . . . The matters raised by Dr. McMahon concerning Defendant's reaction to stress and anxiety appear to describe normal human behavior.
The circuit court further stated that "[t]he fact that after the trial is over, a second, arguably more favorable psychological report is obtained does not establish that the defendant received ineffective assistance at trial." We have affirmed denials of relief in such circumstances. See, e.g., Davis v. State, 875 So.2d 359, 372 (Fla.2003) (finding that, although the new expert's testimony "may be characterized as a `more favorable mental health expert'. . . trial counsel was not deficient simply because [the defendant] . . . secure[d] a `more favorable' report on postconviction"); Asay v. State, 769 So.2d 974, 985 (Fla. 2000) (finding that "counsel . . . conduct[ed] a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information," even though the defendant secured the testimony of a more favorable mental health expert for a postconviction evidentiary hearing).
*1189 Even if trial counsel committed error, Jones cannot demonstrate prejudice. The circuit court concluded that, "[i]n many respects, Dr. McMahon's testimony was consistent with Dr. Miller's." There is no reasonable probability that Dr. McMahon's testimony would have changed the jury's recommendation of death or the trial court's imposition of the death penalty. It does not yield any new information and, therefore, does not undermine our confidence in the outcome of the penalty phase. Any failure to investigate mental health mitigation beyond Dr. Miller's report, therefore, did not deprive Jones of a fair trial. Accordingly, we affirm the circuit court's findings.
Jones next argues that trial counsel rendered ineffective assistance by failing to present mitigating evidence of his positive and cooperative behavior throughout the proceedings and while in jail. This claim is legally insufficient as pled. Jones makes the conclusory allegation that prejudice resulted from trial counsel's failure, without specifying whether a reasonable probability exists that the outcome of the penalty phase would have been different. See Armstrong v. State, 862 So.2d 705, 712 (Fla.2003) (finding no error in the trial court's denial of the defendant's claim, in which he asserted a mere conclusory allegation of prejudice without any degree of specificity as to how the outcome of the proceeding would have been different). "A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied." Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). Because Jones merely asserts prejudice, without factual allegations illustrating how trial counsel's failure deprived him of a fair trial, we need not address Strickland's performance prong. Accordingly, we deny relief on this claim.
Lastly, Jones claims that trial counsel rendered ineffective assistance by failing to present additional mitigating evidence through testimony from friends and family members. In particular, he lists several witnesses who could have testified regarding Jones's remorse for his crimes: Abigail Taylor, Porsha Hernandez, Harris (Jones's sister), Lee Houston (Jones's childhood friend), Walker (Jones's best friend), Alton Jones (Jones's brother), and Jones's parents.
Counsel cannot be deemed ineffective for failing to present cumulative evidence. Cole, 841 So.2d at 425. Of the individuals listed above, Taylor, Hernandez, Harris, Alton Jones, and Jones's father testified about Jones's remorse at the evidentiary hearing. However, during the penalty phase, Jones's mother and Jones himself testified that he experienced remorse daily for his crimes. Trial counsel considered and rejected calling additional witnesses to testify about this issue. Testimony from these additional witnesses would have been cumulative to what was presented. Therefore, Jones cannot demonstrate that trial counsel's performance was deficient. Accordingly, we deny this claim.

C. Pecuniary Gain Aggravating Circumstance
In his third claim, Jones argues that trial counsel rendered ineffective assistance by failing to adequately contest the trial court's application of the pecuniary gain aggravating circumstance. He claims that trial counsel did not argue other theories or motives to the jury  for example, that the murder was the result of anger, or that Jones's taking of the paperwork was an afterthought.
"Where an `afterthought' argument is raised, the defendant's theory is *1190 carefully analyzed in light of the entire circumstances of the incident." Bowles v. State, 804 So.2d 1173, 1179 (Fla.2001) (finding that sufficient evidence supported the pecuniary gain aggravator) (quoting Beasley v. State, 774 So.2d 649, 662 (Fla. 2000)). Trial counsel raised this "afterthought" argument during the charge conference, but did not mention it to the jury during his closing argument. In addition, he alluded to an alternative theory at the beginning of his closing argument but never elaborated further.[11] At the evidentiary hearing, he testified that he overlooked this other theory.
In denying this claim, the circuit court found as follows:
[Trial counsel] . . . did argue that pecuniary gain was not a motive. He argued that ample independent records existed to prove Defendant's debt to Pablo Motors so that Jones's taking the records from Mr. Stow[]'s office would not allow him to avoid the obligation. Moreover, [trial counsel] noted that Jones left behind money found on Mr. Stow[] and in Ms. Stow[]'s wallet, demonstrating that Jones was not motivated by financial considerations.
[Trial counsel] was faced with a record that included his own client's testimony regarding a financial dispute with. . . Stow. In his penalty phase argument, [trial counsel] appropriately and understandably emphasized Defendant's lack of any prior criminal record, his family history and the value of his past and future life. The Court finds that [trial counsel's] penalty phase argument was "within the . . . range of reasonable professional assistance" and that Defendant failed to show he was prejudiced by ineffective assistance of counsel.
(Citations omitted.) Trial counsel argued against the application of this aggravator by focusing on those facts that were favorable to his case. He contested the application of this aggravator to the extent he could in light of the overriding financial dispute between Jones and Stow. Accordingly, Jones cannot demonstrate that counsel's performance was deficient.
Even if counsel erred by failing to raise an "afterthought" argument, Jones cannot demonstrate prejudice. On direct appeal, we held that Jones committed the murder for pecuniary gain:
[T]here is no reasonable hypothesis other than that Jones murdered Monique Stow and attempted to murder Ezra Stow in order to obtain ownership of the car and to resolve the problem over the dishonored check. The fact that the car papers were missing from Ezra Stow's desk after the murder and attempted murder support this finding as does the fact that after committing the crimes Jones disposed of the car papers and the gun and hid the car.
Jones, 690 So.2d at 570. In addition, Jones had been unemployed for more than a year and knew that he only had five dollars in his bank account. He had previously bounced six other checks. The check he used to pay Stow bounced. He appeared at San Pablo Motors on March 3 only because Stow requested that he make good on the check. The evidence in favor of the pecuniary gain aggravator was overwhelming and would have refuted any additional theories trial counsel could have used to explain the murder. There is no reasonable probability  one sufficient to undermine our confidence in the outcome  that these alternative theories *1191 would have changed the jury's recommendation of death or the trial court's imposition of the death penalty. Jones has not established either prong of the Strickland test. Accordingly, we deny this claim.

D. Juror Interviews
In his fourth claim, Jones alleges that the trial court erred in denying his request to interview jurors based upon comments some of them were reported to have made in an article published in the Florida Times-Union on March 12, 1995 (after his sentence was imposed). In the article, Zeke McGee, the jury foreman and one of the jurors who voted to recommend death, was reported to have stated: "This young man's case, it was hard. But if you do it once, you could do it again. They say after the first time it gets easier. . . ." Harold Rooks, who also voted to recommend death, stated the following:
I'm just sitting there saying the guy is guilty or he's not guilty. I'm not saying he's going to be electrocuted . . . . That's got to be the judge's decision because he could give him life or whatever.
I think the judge probably knows more about the case than we do . . . because he's got all the other documents. It's good to have that other opinion, that other person, because none of us are perfect.
Finally, Stanley Jefson, who voted to recommend death, stated the following:
I was thinking more about the victims and what happened to them than the defendant. The victims tend to get forgotten in some of these cases. . . .
You can't help but feel an awesome responsibility when you vote for someone's life to be taken.
[I]n this case, the sentence was left up to the judge, and I think that helped people a lot by making sure that the jurors understood that what they said was not the result. . . .
It really didn't enter into my mind that he could get out and do it again. I think that was kind of a one-time incident in Marvin Jones's life. I don't think he would have been a threat to society had he been released. . . . The fact that it seemed to be a one-time incident did not seem to make it harder. . . to vote for [the] death penalty. I mean, when you vote as a member of the jury for the death penalty, I think you are in effect sending a message to other[s] that that is what can happen.
Jones argues that these comments, in part, "raise[] a substantial probability that the verdict in this case was compromised."
"[J]uror interviews are not permissible unless the moving party has made sworn allegations that . . . would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings." Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001) (citing Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97, 100 (Fla.1991)). "All that is required . . . are facts which allege an overt act that may have prejudiced the jury. . . ." Gould v. State, 745 So.2d 354, 358 (Fla. 4th DCA 1999) (where the defendant alleged that "a bailiff may have told the jurors that they comprised the third jury to sit on the case"). Jones has not alleged any overt act or error that may have prejudiced the jury and, instead, relies on the comments in the article.
However, "[t]he Florida Evidence Code. . . provid[es] that `[u]pon an inquiry into the validity of a verdict or indictment, a juror is not competent to testify as to any matter which essentially inheres in the verdict or indictment.'" Devoney v. State, 717 So.2d 501, 502 (Fla.1998) (quoting 90.607(2)(b), Fla. Stat. (1993)). The jurors' mental thoughts and beliefs which relate to *1192 what occurred in the jury room during the jury's deliberation "inhere[] in the verdict." Id. at 502, 504 (where, "contrary to the court's explicit instructions, jurors had discussed the speeding ticket during deliberations," finding that those "discussions. . . inhered in the verdict"); see also Johnson, 593 So.2d at 210 (holding that the jury foreman's testimony regarding jury pollings during deliberations and the jury's understanding of the court's instructions "essentially inheres in the verdict" as it relates to what occurred in the jury room during the jury's deliberations). Jurors cannot be asked about their "emotions, mental processes, or mistaken beliefs." Maler, 579 So.2d at 99 (emphasis added) (quoting State v. Hamilton, 574 So.2d 124, 128 (Fla.1991)). This Court has "cautioned against permitting juror interviews to support postconviction relief for allegations which focus upon jury deliberations." Parker v. State, 904 So.2d 370, 380 (Fla.2005); see also Mitchell v. State, 527 So.2d 179, 181-82 (Fla.1988) (denying the defendant's request for juror interviews based on an affidavit alleging that one of the jurors stated she was pressured into returning a guilty verdict and other jurors had placed the burden of proof on the defendant).
The jurors' comments in the newspaper article expressed their thoughts, impressions, reasoning, and rationale for their verdict. Their comments do not reveal any improper external influence but, instead, show "proper, normal, jury deliberations and thought processes." It is irrelevant whether the jurors' thoughts and beliefs were incorrect or reflect a misunderstanding or misapplication of the facts or the law. Such mistakes are beyond inquiry. See Maler, 579 So.2d at 99. Accordingly, we deny this claim.

E. Loss of Trial Counsel's Files
In his fifth claim, Jones argues that the loss of trial counsel's files in a fire hindered collateral counsel's investigation and violated Jones's due process rights. At the evidentiary hearing, trial counsel testified that there was a fire in his office on or around March 21, 1994. The fire destroyed trial counsel's office building and his files related to Jones's case, including pleadings, correspondence, transcripts, and personal notes. The fire was caused deliberately because Molotov cocktails were thrown through the window. However, the trial court found that the fire was not specifically intended to destroy counsel's files related to Jones's case. In denying this claim, the circuit court found as follows:
Defendant's trial file was destroyed through no fault of any one directly involved in this case. [Trial counsel's] testimony establishes that the fire at his office was an uncontrollable and unforeseeable act that was not intended purposely to destroy Defendant's . . . file. Although the destruction of the . . . file is unfortunate, this Court finds that the absence of a . . . file has not prejudiced Defendant and thus a violation of Defendant's constitutional rights has not been established. Defendant was granted a hearing and was permitted to question [trial counsel] concerning all aspects of his representation of Defendant. Accordingly, Defendant has been afforded a sufficient opportunity to adequately explore his claims for post-conviction relief.
The standard of review for the circuit court's denial of this claim is abuse of discretion. Parker, 904 So.2d at 379. The law is scarce on this issue. However, the Eleventh Circuit has stated that "[w]hen a defendant asserts prejudice because of the loss of evidence, he must show that the loss impaired his ability to provide a meaningful defense." United States v. Solomon, *1193 686 F.2d 863, 872 (11th Cir.1982) (citing United States v. Cederquist, 641 F.2d 1347 (9th Cir.1981)) (denying appellant's claim that the records destroyed in a fire at his motel would have shown facts essential to his defense because he suffered minimal prejudice).
We agree with the circuit court's analysis. Jones cannot demonstrate that the absence of trial counsel's files hindered collateral counsel's investigation. Furthermore, the only items destroyed in the fire that could not be recreated or replaced were trial counsel's personal notes of any interviews he had with Jones, Jones's relatives, or other witnesses, as well as phone messages and impressions and theories of the case. It is highly unlikely that these notes would have provided any additional information beyond what trial counsel testified about at the hearing. Moreover, these personal notes and impressions most likely would support the State's position by identifying specific reasons for trial counsel's choice not to call certain witnesses or pursue various courses of action. The circuit court did not abuse its discretion in denying this claim. Accordingly, we affirm that decision.

F. The Ring Claim
In his final claim, Jones argues that Florida's capital sentencing procedures are unconstitutional in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Jones's conviction and sentence were final in 1997, five years before the United States Supreme Court decided Ring. We recently held that Ring is not retroactive. Johnson v. State, 904 So.2d 400, 412 (Fla.2005). Thus, Jones's claim is denied.

III. Conclusion
For the reasons explained above, we affirm the circuit court's denial of Jones's postconviction motion.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The facts are taken from Jones's direct appeal. See Jones, 690 So.2d at 569-70.
[2] These were: (1) Jones had no significant history of prior criminal activity and (2) aspects of his character and record, namely: that he served eight years in the Navy in responsible positions and with commendations and an honorable discharge, that he is married with two children that he and his wife supported, that during his formative years he had the advantage of a secure middle-class home with successful parents, that there was no evidence that he suffered any material, spiritual, or moral privation, and that Jones's parents were supportive, hardworking, industrious, and successful.
[3] These were: (1) the trial court erred in finding that the murder was committed for pecuniary gain and in instructing the jury on pecuniary gain; (2) the trial court erred in giving the standard jury instruction to define the cold, calculated, and premeditated (CCP) aggravating circumstance; (3) the trial court erred in finding the CCP aggravator; and (4) the death penalty was not appropriate.
[4] Jones filed a supplement to the amended 3.850 motion in August 2002, raising additional arguments based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[5] The following claims are procedurally barred because they should have been raised on direct appeal: 4(a) (the trial court erred in denying his request to interview jurors based upon the allegations in his 1994 Amended Motion for New Trial), 6(a)-(d) ((a) the use of a contemporaneous conviction to support the prior violent felony aggravating circumstance is unconstitutional; (b) Florida's standard jury instructions impermissibly shift the burden of proof to the defendant; (c) Florida's standard jury instructions violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (d) Florida's standard jury instructions fail to properly instruct the jury regarding the nature, meaning, and effect of mitigation), 9(a)-(f) ((a) Florida's death penalty statute provides no "standard of proof" for weighing aggravating and mitigating circumstances; (b) Florida's death penalty statute does not define "sufficient aggravating circumstances"; (c) Florida's death penalty statute does not sufficiently define each of the aggravating factors; (d) Florida's death penalty statute does not have the independent reweighing of aggravating and mitigating factors; (e) aggravating factors are applied in a vague and inconsistent manner and juries have received unconstitutionally vague instructions; (f) Florida law violates the Eighth Amendment by creating a presumption of death if a single aggravating factor is found), and 10 (death by lethal injection is cruel and unusual punishment).
[6] Claim 9(g) (ineffective assistance of counsel for failing to object to the penalty phase jury instructions) is such a claim. Also, claim 5(a) broadly asserts that Florida's law governing access to public records is unconstitutional, but Jones fails to identify the specific records he has been improperly denied. Therefore, that portion of his argument is unpreserved as insufficiently argued.
[7] We have previously addressed claim 3(a) (the jury instructions for the pecuniary gain aggravator are unconstitutionally vague and overbroad) and have rejected it. See Kelley v. Dugger, 597 So.2d 262, 265 (Fla.1992) (citing Brown v. State, 565 So.2d 304, 308 (Fla. 1990)). Other claims we summarily reject as meritless are 1(a) (ineffective assistance of counsel for failing to object to the CCP jury instructions, which this Court later rendered unconstitutional in Jackson v. State, 648 So.2d 85 (Fla.1994)), 4(b) (ineffective assistance of counsel for failing to pursue juror interviews), 3(b) (ineffective assistance of counsel for failing to object to the jury instructions for the pecuniary gain aggravator), and 6(e)-(g) ((e) ineffective assistance of counsel for failing to object to the jury instructions for the prior violent felony aggravator; (f) ineffective assistance of counsel for failing to request a limiting instruction on victim impact evidence; and (g) ineffective assistance of counsel for failing to object to the penalty phase jury instructions).
[8] Claim 7(a) (Jones is innocent of the death penalty); and 7(b) (the death penalty is not appropriate).
[9] These six issues correspond to claims 1(b), 2, 3(c), 4(c), 5(b), and 8.
[10] In his brief, Jones also mentions the testimony of Dr. Elizabeth McMahon, who was hired as a witness only for the evidentiary hearing. However, Jones focuses mainly on Dr. Miller's testimony while briefly mentioning Dr. McMahon at the beginning of the analysis. In his second claim, Jones places more emphasis on Dr. McMahon's testimony. Furthermore, the issue of whether or not counsel was ineffective for failing to secure Dr. McMahon and present her testimony properly belongs in the next section.
[11] At the beginning of his closing argument, trial counsel stated: "[Y]ou can conclude the State's theory . . . for which . . . there is proof to the contrary and I'll get to that, that something happened in that trailer between . . . Jones, Monique Stow and [Ezra] Stow . . . ."